1
2
3
4
5
6
7
8                        **UNITED STATES DISTRICT COURT**

9                        **SOUTHERN DISTRICT OF CALIFORNIA**

10   UNITED STATES OF AMERICA,                   CASE NO. 15cr3175 JM

11                              Plaintiff,        ORDER DENYING MOTION TO
                                                  SUPPRESS DEFENDANT MEZA'S
12       v.                                       STATEMENTS; DENYING MOTION
                                                  TO SUPPRESS EVIDENCE
13   DAVID ENRIQUE MEZA; TAYLOR
     MARIE LANGSTON,
14                              Defendant.

15

16       Defendant David Enrique Meza ("Meza"), joined by co-defendant Taylor Marie

17   Langston ("Langston"), moves to suppress statements and to suppress evidence.  The

18   Government opposes the motion.  Having carefully considered the matters presented,

19   the court record, appropriate legal authorities, and the arguments of counsel, the court

20   denies the motion to suppress statements and denies the motion to suppress evidence.

21                              **BACKGROUND**

22   The Indictment

23       On December 22, 2015, the Government charged Meza and Langston in a 4

24   count indictment.  Count 1 charges Meza only with interstate or foreign domestic

25   violence resulting in death in violation of 18 U.S.C. §2261(a)(1).  Count 2 charges

26   both Meza and Langston with conspiracy to obstruct justice by impeding an official

27   proceeding in violation of 18 U.S.C. §§1512(c)(2) and (k).  Count 3 charges Langston

28   only with obstruction of justice for lying to an FBI agent about her and Meza's

presence at a friend's house in Tijuana in violation of 18 U.S.C. §§1512(c)(2). Count 4 charges Langston only with making a false statement to an FBI agent in violation of 18 U.S.C. §1001.

The Crimes Charged

The Government proffers that Meza is allegedly a male prostitute and adult film actor. In 2013 a wealthy Texan named Jake Merendino became one of Meza's customers. Meza and Merendino carried out a relationship over the following years. Merendino desired to leave Texas and retire in Mexico. In late 2014 and 2015, Meza and Merendino searched properties to buy in Baja California. Merendino decided to buy a $300,000 condo in Rosarito and, on the closing documents, identified Meza as the beneficiary in case of death. By April 2015, Langston, Meza's fiance, was 9 months pregnant.

Two days after closing on the condo, on May 1, 2015, Meza and Merendino checked into a hotel in Rosarito because the new condo was not ready for habitation. They arrived in separate vehicles - Meza on a motorcycle and Merendino in a Range Rover. Meza then returned to San Diego to meet with Langston. In the early morning hours of May 2nd, Meza and Langston went to Mexico - Meza driving the motorcycle, and Langston an SUV.

At 2:00 a.m., Meza called Merendino at the hotel and told him his motorcycle had broken down. Merendino drove to assist Meza. Once Merendino arrived at the site, Meza allegedly stabbed him to death. Meza and Langston crossed back into the U.S. at about 4:00 a.m.

A few days later, Meza called a friend in Mexico and allegedly asked him to create a false alibi for him and Langston. The friend was told to tell any investigators that he was with Meza and Langston on the date of the murder. On May 18, 2015, Meza sought to probate a holographic will in Texas, naming himself as the sole beneficiary of the Merendino estate.

The Search and Interviews

On June 4, 2015, federal agents executed a search warrant at Meza's apartment. At that time, Meza made the statements subject to the present motion to suppress statements. When armed San Diego Police Detective ("SDPD") James Brown, FBI Agent Benjamin Inman, and five other agents arrived at the apartment, Meza answered the door in his underwear. He was handcuffed and escorted outside until the apartment was cleared. Within a few minutes, and once the apartment was "cleared," Agent Inman brought a T-shirt and pair of jeans to Meza. Approximately 5 - 10 minutes later, SDPD Brown approached Meza, without his raid jacket, gun, or visible badge. SDPD Brown told Meza that he wanted to talk with him, and asked the FBI to remove the handcuffs. After assisting Meza with his clothing, SDPD Brown suggested that they speak in a car, an unmarked car parked about 1/4 block away. SDPD Brown unlocked the car and Meza sat in the passenger seat. SDPD Brown started the car for the air conditioning. He did not lock the doors nor drive away. SDPD Brown's partner, Detective Van Houten was seated in the back of the vehicle.

SDPD Brown provided Meza with the Miranda advisements. Meza argues that the warnings were ineffectual because they were "swallowed," not clearly intelligible, and failed to inform Meza that he could stop the interview at any time.

During the interview of approximately four hours, Meza at first told SDPD Brown and Van Houten that he earned a living by working at the Navy Exchange and by doing construction work, he met Merendino by chance, and his relationship with him was not romantic or sexual. He also stated that he was not in Mexico on the day of Merendino's murder. As SDPD Brown continued his interrogation, Meza admitted that he was a male prostitute and had a romantic and sexual relationship with Merendino. He stated that he lured Merendino to the side of the road but did not kill him. He intended only to steal some stereo equipment. He left Merendino alive on the side of the road.

15cr3175

1    **The Motion to Suppress Statements**

2         <u>Custodial Interrogation</u>

3         Meza argues that he was in custody at the time of his June 4th interview and,

4    therefore, entitled to receive the Miranda advisements.  The Government argues that

5    Meza was not in custody.

6         The Miranda warnings must be provided to an interviewee who is "in custody."

7    <u>Thompson v. Keohane</u>, 516 U.S. 99, 102 (1995).  An individual is in custody for

8    Miranda purposes when the suspect has been "deprived of his freedom of action in any

9    significant way."   <u>United States v. Craighead</u>, 539 F.3d 1073, 1082 (9th Cir. 2008)

10   (quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)).  Such a deprivation occurs

11   when the "suspect's freedom of action is curtailed to a 'degree associated with formal

12   arrest.'" <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984) (citation omitted).  The

13   analysis of the circumstances of the deprivation "is an objective one; [the court asks]

14   whether 'a reasonable [person] in the suspects's position would have understood his

15   situation . . . as the functional equivalent of formal arrest.'" <u>United States v. Revels</u>,

16   510 F.3d 1269, 1273 (10th Cir. 2007) (quoting <u>Berkemer</u>, 468 U.S. at 442).  "Whether

17   a suspect is in custody turns on whether there is a 'formal arrest or restraint on freedom

18   of movement of the degree associated with a formal arrest.' [Citations omitted].  This

19   inquiry requires a court "to examine the totality of the circumstances from the

20   perspective of a reasonable person in the suspect's position." <u>United States v.</u>

21   <u>Crawford</u>, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc).

22        The test is whether a "reasonable person would have felt he or she was not at

23   liberty to terminate the interrogation and leave." <u>Howes v. Fields</u>, 132 S. Ct. 1181,

24   1189 (2012) (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 322-323 (1994)).  The

25   custodial determination, viewed from the totality of circumstances, "depends on the

26   objective circumstances of the interrogation, not on the subjective views harbored by

27   either the interrogating officers or the person being questioned." <u>Stansbury</u>, 511 U.S.

28   at 323.  The factors to be considered include "all the circumstances surrounding the

interrogation," including the "location of the questioning," "its duration," "statements made during the interview," "the presence or absence of physical restraints," and "the release of the interviewee at the end of the questioning." Howes, 132 S. Ct. at 1189. The Ninth Circuit has cited similar factors which are "among those likely to be relevant":

> 1) the language used to summon the individual; 2) the extent to which the defendant is confronted with evidence of guilt; 3) the physical surroundings of the interrogation; 4) the duration of the detention; and 5) the degree of pressure applied to detain the individual.

United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).

In Craighead the Ninth Circuit adopted the "approach of using the 'police-dominated atmosphere' as the benchmark for custodial interrogation in locations outside of the police station [finding that it] is consistent with the Supreme Court's adaptions of Miranda to these types of locations." Id. at 1083. In Craighead, eight law enforcement agents from three different agencies went to the defendant's home to execute a search warrant for child pornography on Craighead's computer systems. At least five agents wore flak jackets, some had unholstered their weapons, and others were armed. SA Andrews requested to talk with Craighead and stated that he was free to leave, he was not under arrest, would not be arrested that day, and that any statement he would make would be voluntary. Two agents and Craighead then went to a small, cluttered back room. The defendant was not handcuffed. SA Andrews testified that it was her practice to tell interviewees that they were free to leave once when escorted to an interrogation location and again at the beginning of the interview. She did not specifically recall advising defendant a second time that he was "free to leave."

Craighead testified that he did not feel free to leave. In order to exit the small back room, he would have had to ask the detective to move. He also testified that "the prevailing mood of the morning" left him with the impression that he was not free to leave. He also thought that even if SA Andrews had permitted him to leave the other officers would not have let him leave. He did not know if he needed permission from

1    all three law enforcement agencies executing the search warrant before he was allowed
2    to leave.      During the interview, Craighead confessed to downloading child
3    pornography.  He moved to suppress the statements made to SA Andrews based upon
4    the failure of SA Andrews to provide him with his <u>Miranda</u> advisements.  The district
5    court denied the motion to suppress, finding that the interview was not custodial.

6         The Ninth Circuit reversed.  The Ninth Circuit reasoned that a search of one's
7    home presents analytical challenges in light of the "uniqueness of an interrogation
8    conducted within the suspect's home." <u>Craighead</u>, 539 F.3d at 1083; <u>Wayne v. Layne</u>,
9    526 U.S. 603, 610 (1999) ("The Fourth Amendment embodies this centuries-old
10   principle of respect for the privacy of the home"); <u>Mincey v. Arizona</u>, 437 U.S. 385,
11   393 ("[T]he Fourth Amendment reflects the view of those who wrote the Bill of Rights
12   that the privacy of a person's home and property may not be totally sacrificed in the
13   name of maximum simplicity in enforcement of the criminal law").  The analysis by the
14   Ninth Circuit focused on the application of "the traditional <u>Miranda</u> inquiry to an in-
15   home interrogation." <u>Craighead</u>, 539 F.3d at 1083.   Noting that <u>Miranda</u> instructs that
16   its advisements are to be provided when a suspect is held incommunicado "in a police-
17   dominated atmosphere," <u>Miranda</u>, 384 U.S. at 445, the Ninth Circuit adopted and
18   applied a four factor test to assist the court in determining whether the police created
19   a police-dominated environment such that the suspect could not reasonably believe he
20   was free to leave.  In making this fact-intensive inquiry, the district court is to consider
21   all relevant factors including "(1) the number of law enforcement personnel and
22   whether they were armed; (2) whether the suspect was at any point restrained, either
23   by physical force or by threats; (3) whether the suspect was isolated from others; and
24   (4) whether the suspect was informed that he was free to leave or terminate the
25   interview and the context in which any such statements were made." <u>Id.</u> at 1084.

26        Applying this four factor test, the Ninth Circuit concluded that Craighead was
27   in custody for purposes of <u>Miranda</u>.  Accordingly, the failure of law enforcement to
28   provide the <u>Miranda</u>  advisements, or to communicate effectively that the suspect was

"free to leave," required suppression of Craighead's statements.  In applying the first factor, the Ninth Circuit noted that "the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere." Id. at 1085.  The fact that eight armed agents arrived at Craighead's home  to execute the search warrant satisfied this factor.  Second, the totality of the circumstances (the presence of the agents, Craighead being escorted to a back room for the interview with the door closed, an agent standing by the door, and Craighead's belief that he was under guard) indicated that it was objectively reasonable for Craighead to believe that his "freedom of action was restrained in a way that increased the likelihood that [he] would succumb to police pressure to incriminate himself." Id. at 1086.  Third, "isolating the suspect from family and friends is one of the distinguishing features of a custodial interrogation." Id. at 1087. The record indicated that Craighead was also isolated from other law enforcement personnel during the interview.  The FBI excluded one government agent from the interview site.  The Ninth Circuit noted that the "FBI may exclude whomever it chooses from an interrogation; Miranda requires that if the FBI isolates the suspect, and the suspect does not reasonably believe he is free to leave, warnings must be given." Id. at 1087.  Fourth, Craighead was told that he was not under arrest, he would not be arrested that day regardless of what information he provided, his statements were voluntary and he was free to leave.  Despite the representations that he was free to leave, the Ninth Circuit, viewing the totality of the circumstances, concluded that "a reasonable person in Craighead's position would not have actually 'felt' he was free to leave." Id. at 1089.

Here, applying relevant factors, including those identified in  Craighead, the court concludes that Meza's freedom of action was severely restrained by Government agents such that Meza, under the totality of circumstances, was is custody and entitled to receive the Miranda advisements.  At 7:00 a.m. seven armed FBI  and SDPD detectives, dressed in raid jackets and with weapons drawn by several of the agents,

15cr3175

entered Meza's apartment by using a pry bar.  Meza, dressed in his underwear, answered the door and was immediately instructed to place his hands behind his back where he was handcuffed and all movement restrained.  Meza was then isolated and escorted to the street.  After about five minutes, Officer Inman retrieved some clothes and later removed the handcuffs when Meza was assisted in getting dressed.  The first three <u>Craighead</u> factors favor a finding that Meza was in custody for purposes of Miranda.  Meza was surrounded by a strong and overwhelming armed police presence in his home, the door to his apartment was forced open with a pry bar, he was handcuffed, and he was isolated from his home and fiance.

At this point, pursuant to a prearranged interview plan, SDPD Brown approached Meza and told him that he wanted to talk.  SDPD Brown and his partner agent escorted Meza to SDPD Brown's car.  SDPD Brown informed Plaintiff that he was not under arrest.  Notably, there is no evidence to show that Meza was informed that he was free to leave or that he could terminate the interview at any time.  Meza was then placed in an enclosed unmarked automobile for four hours where he was subjected to non-stop questioning, mostly by SDPD Brown who was assisted by Detective Van Houten.  Throughout the lengthy four-hour interview, at least one police officer remained outside the vehicle at all times.  Thus, it is reasonable to conclude that Meza was not free to leave.  By any measure, Meza was placed in a police dominated environment which mandated that he receive the Miranda advisements.  Based upon the totality of circumstances, the court concludes that Meza was in custody at the time of his interview.  Meza was therefore entitled to receive the Miranda advisements.

In sum, Meza was entitled to receive the Miranda advisements.

<u>Adequacy of the Miranda Warnings</u>

The next issue is whether the Miranda advisements provided to Meza were adequately conveyed and whether Meza voluntarily waived those advisements.  Before a custodial interrogation may go forward, Miranda requires that the interviewee be advised that he has the right to remain silent, anything he says can be used against him

15cr3175

1  in court, he has the right to an attorney, and one will be appointed for him if he cannot

2  afford one. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

3      The beginning of the taped interview sets forth a statement by SDPD Brown

4  confirming that he told Meza before the taped interview began that he was not under

5  arrest and then proceeded to tell him that he had the right to remain silent, the right to

6  an attorney during the questioning, the right to the appointment of counsel if he could

7  not afford one, and that anything he said could be used against him in court. SDPD

8  Brown then stated:

9      Q: "Okay. You understand all that stuff?"

10     A: "Mm-hm."

11     Meza contends that the warnings provided were inadequate because they were

12 equivocal, ambiguous, and inaccurate. Meza also contends that he should have

13 specifically been told he could stop the interview at any time. These arguments are not

14 persuasive. While the recorded conversation demonstrates that SDPD Brown used

15 colloquial language to describe the Miranda advisements, the court concludes that the

16 language used sufficiently informed Meza of his Miranda advisements.  This is not

17 like <u>Doody v. Ryan</u>, 649 F.3d 986 (9th Cir. 2011), relied upon by Meza, where the

18 agent provided a rambling, convoluted, erroneous, and detour laden recitation of the

19 Miranda advisements that took 12 pages of transcripts to cover the relatively short

20 Miranda advisements. The Ninth Circuit concluded that the agent downplayed the

21 warnings' significance and expressly misinformed the defendant about the right to

22 counsel.

23     This case is markedly different from <u>Doody</u>. Neither SDPD Brown nor his use

24 of colloquial language misled Meza. Rather, the advisements effectively conveyed

25 Meza's rights as required by Miranda. Nothing more was required.[1]

26     In sum, the court concludes that the warnings provided by SDPD Brown were

27

28     [1] The court rejects Meza's contention that SDPD Brown swallowed and
mumbled the Miranda advisements. The recorded conversation does not support this
argument.

1  adequate to inform Meza of his Miranda rights.

2      The Miranda Waiver/Coercion/Voluntariness

3      Immediately after providing the Miranda advisements, SDPD Brown discussed
4  how another agent would be joining them and then inquired into general biographical
5  background issues.  Other than the "Mm-hm," there was no response by Meza to the
6  Miranda advisements.  After providing Meza with the Miranda advisements, Meza
7  answered questions during a four-hour period of time.

8      Meza contends that the manner in which SDPD Brown delivered the Miranda
9  warnings minimized the force of the warnings such that his response and implied
10 waiver of Miranda is not valid.  Meza also cites Miranda for the proposition that the
11 Government has a "heavy burden" to show that a waiver of Miranda is knowing
12 voluntary, and intelligent.  Meza also contends that his consent was coerced because
13 he was still under the emotional influence of the armed search at his apartment and
14 police presence.

15     In Berhuis v. Thompson, 560 U.S. 370 (2010), the Supreme Court clarified that
16 the "heavy burden" language in Miranda simply means that the Government has the
17 "burden to establish waiver [of Miranda] by a preponderance of the evidence."  Id. at
18 384.[2]  Miranda may be waived expressly or implicitly.  Berhuis makes clear that an
19 implicit waiver of Miranda may be shown where (1) the accused is provided with the
20 Miranda warnings; (2) the accused understands those advisements; and (3) the accused
21 makes uncoerced statements.  Id.  "As a general proposition, the law can presume that
22 an individual who, with a full understanding of his or her rights, acts in a manner
23 inconsistent with their exercise has made a deliberate choice to relinquish the
24 protection those rights afford."  Id. at 385.

25     Here, the court concludes that Meza waived his Miranda advisements.  From
26 Meza's  responses to the Miranda advisements, he understood those rights,  Meza

27

28      [2] The Miranda Court stated that "a heavy burden rests on the government to
   demonstrate that the defendant knowingly and intelligently waived his privilege against
   self-incrimination and his right to retained or appointed counsel." Id. at 475.

replied "yes" or 'Hm-hm" when each warning was given to him and again when asked if he understood all the rights collectively.   On the record of this case, the weight of the evidence demonstrates that Meza understood each Miranda advisement and then proceeded to answer questions coherently and without protest.  This is sufficient to establish that he waived the Miranda advisements.

In sum, the court concludes that Meza voluntarily, both explicitly and implicitly, waived the Miranda advisements.

Invocation of Miranda

Meza contends that he twice invoked the right to remain silent but the Agents continued their questioning.   First, after some intense questioning, Meza stated, "I already told you what I'm oh, what I - what happened.  What I know." (Exh. A at p.129.)  Meza also stated, "I don't have anything to say.   That's - that's all.  You've pretty much made me tell you everything that I - I'm not supposed to."  (Exh. A at p.167).  Meza represents that these statements are sufficiently clear and unambiguous such that the questioning should have immediately terminated.

It is well-established that an accused may invoke their right to silence and terminate police questioning only by "unambiguously" invoking that right.  Berghuis, 560 U.S. at 381-82.  Meza's first statement, "I already told you what I'm oh, what I what happened.  What I know," does not come close to a clear and unequivocal invocation of the right to silence.  Rather than informing SDPD Brown that he wanted to stop the interview, Meza merely stated he had "already [stated] what happened." This was not an unambiguous invocation.  Rather, the statement reasonably appears to be no more than a denial, or effort to withhold, further information.  This falls leagues short, for example, of the clear invocation recently addressed in Jones v. Harrington, 2016 .D.A.R. 7446 (9th Cir. 2016) ("I don't want to talk no more, man.").

As for Meza's statement, "I don't have anything to say.  That's - that's all. You've pretty much made me tell you everything that I - I'm not supposed to," it suffers from the same invocation deficiencies.  First, the words, "pretty much," implies

Meza had more to tell.  Second, it suggests he was "supposed to" hold some information back.  On behalf of an accomplice?  For what purpose?  Who else was involved?  These were all legitimate questions an interrogator would have reasonably entertained given Meza's curious and unclear statement.  Again, Meza's musing fell far short of an unambiguous invocation of silence.

Although a suspect may selectively invoke the right to silence, see Hurd v. Terhune, 619 F.3d 1080, 1085 (9th Cir. 2010), and may even limit the manner of interrogation, see Arnold v. Runnels, 421 F3d. 859, 866 (9th Cir. 2005), invocation may only be premised upon a statement objectively determined to be unambiguous in its import that questioning cease.  It cannot, and should not, be a dodge, equivocal, a mere denial of further information.

In sum, the court concludes that Meza did not invoke the right to remain silent.

**The Motion to Suppress Evidence**

Meza moves to suppress evidence seized from his apartment in alleged violation of the warrant requirements.  He contends that the warrant was overbroad and lacked specificity because, in part, the warrant authorized agents to seize "data," a vague and overbroad term.  Furthermore, Meza contends that the search warrant should be limited to the time period of April 29, 2015 through May 3, 2015 because these are the dates referred to in the Probable Cause Statement.

After the initial search, Government agents asked Meza if they could reenter the apartment.  He consented, verbally and in writing, that the agents could reenter the apartment. The agents seized a pair of shoes and an iPad owned by Merendino.

The 4th Amendment requires that warrants be based upon probable cause and describe with particularity the things to be seized.

> In determining whether a description is sufficiently precise, we have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more

1    particularly in light of the information available to it at the time the
2    warrant was issued.

3    United States v. Spilotro, 800 F.2d 959, 963 (9th Cir.1986) (internal citations omitted).

4    The warrant and accompanying affidavit set forth Meza and Langston's activities
5    preceding and following the alleged killing of Merendino.  The affidavit identifies,
6    based upon Agent Van Houten's experience and training, that Defendants and
7    Merendino likely communicated via cell phone, and both Defendants possessed email
8    and other social media accounts. The application for warrant identified that the scope
9    of the data (or other electronic communications) search is limited by identifying the
10   seizure of items that (1) tend to show efforts to coordinate meeting; (2) provide links
11   to Defendants and Merendino; (3) tend to identify co-conspirators; (4) tend to identify
12   travel; (5) tend to identify the individual with control or access to the device; and (6)
13   tend to place in context the creator, recipient or establish the time of creation of the
14   date or communications.  Here, Magistrate Judge Crawford reasonably found that the
15   warrant and declarations establish probable cause to believe that relevant items would
16   be seized from electronic devices.

17   The court concludes that the warrant is not overbroad.  While the term "data,"
18   standing in isolation, may be overly broad, the warrant provides sufficient guidance to
19   government agents to limit their search to the six limitations described in the warrant.

20   Meza also contends that all electronic searches must be limited to the time period
21   between April 29 and May 3 because the warrant application generally describes events
22   occurring during this period of time.  Some of the electronic data retrieved falls outside
23   this four day period of time.  Notably, the warrant does not limit the data to be seized
24   to this limited period in time.  Rather, the data or communications are limited by the
25   six limitations described above.  In other words, the most important limitation on the
26   search is that items seized relate to the underlying crimes, and not some artificial time
27   limit.

28   / / /

In sum, the court denies both the motion to suppress statements and to suppress evidence.

**IT IS SO ORDERED.**

DATED:  August 25, 2016

Hon. Jeffrey T. Miller
United States District Judge

cc:          All parties

15cr3175