UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>DAVID ENRIQUE MEZA,<br><br>　　　　　　　　　　Defendant. | Case No.: 15cr3175-1 (JM)<br>　　　　　21cv1650 (JM)<br><br>**ORDER ON DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255** |

Presently before the court is Petitioner/Defendant David Enrique Meza's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. (Doc. No. 316). Having considered the Parties' arguments and the record in this case, the court **DENIES** Defendant's Motion.

## BACKGROUND

### I. Factual Background

The facts underlying Defendant's conviction were summarized in the Ninth Circuit's memorandum opinion on Defendant's direct appeal (Doc. No. 314) and the Government's Opposition to Defendant's § 2255 Motion (Doc. No. 324). The salient facts are repeated below.

1

In 2013, Jake Clyde Merendino was a wealthy man in his fifties living in Houston, Texas. (Doc. No. 314 at 6). In the summer of 2013, Merendino took a vacation to San Diego, California. *Id.* During his vacation, Merendino answered an online advertisement posted by Defendant. *Id.* Defendant came to Merendino's hotel room and stayed for an hour. *Id.* A few days later, the two met again for dinner. *Id.* Afterward, Merendino paid for Defendant to visit him in Houston where they spent a weekend together. *Id.* Merendino visited Defendant once more that summer in San Diego, where he bought Defendant a car, paid for Defendant to enroll in college courses, and began sending Defendant regular wire payments. *Id.* at 6–7.

At the same time, Defendant was also involved in a relationship with a nineteen-year old woman named Taylor Langston. *Id.* at 7. The pair got engaged in September 2013. *Id.* Over the course of the following year, Merendino visited Defendant in San Diego several times, bought Defendant another car and a motorcycle, and added Defendant to his bank account. *Id.* In December 2014, Merendino wrote out a will leaving "everything" to Defendant. *Id.*

Soon thereafter, Merendino bought a condominium unit in a luxury condominium complex outside Rosarito, Mexico and listed Defendant as the beneficiary. *Id.* Meanwhile, Defendant told Langston and his family that the reason for his absences and his source of income was a man named "George," for whom Defendant claimed to be working for as a personal assistant. *Id.*

In October 2014, Langston became pregnant. *Id.* As the due date approached, Defendant began telling people that "George" was sick and insinuated that he did not have long to live. *Id.* Defendant and Langston made plans about what they would do "when we get George's car." *Id.*

In late April 2015, Merendino left Texas to move with Defendant into the condominium outside Rosarito, Mexico. *Id.* On May 1, 2015, after signing the closing documents, Defendant and Merendino checked into a small hotel where they spent the evening together. *Id.* Later that night, Defendant rode his motorcycle back to San Diego.

*Id.* Sometime after midnight, on May 2, 2015, Defendant returned to Mexico on his motorcycle and stopped on the road a few miles from the hotel. *Id.* at 7–8. There, Defendant called Merendino and told him his motorcycle had stalled and he needed assistance. *Id.* at 8. Merendino left the hotel at around 2:00 a.m. and never returned. *Id.*

That morning, Mexican police found Merendino's body. *Id.* An autopsy later showed Merendino had been stabbed twenty-four times, including two large slash wounds to the neck. *Id.* His body had then been dragged and thrown into a nearby ravine. *Id.* Video surveillance showed that Defendant had crossed the border back into the United States after Merendino's death and changed his clothes before crossing. *Id.*

After the killing, Defendant withdrew the remaining funds from the bank account he shared with Merendino and sent a copy of the handwritten will (naming Defendant as the beneficiary of a $1.3 million estate) to a lawyer in Texas to be probated. *Id.* Defendant also performed Google web searches about the killing and reached out to an acquaintance to assist with a false alibi. *Id.* Over the following weeks, Defendant began sending Langston text messages and a voicemail expressing "regret," how Defendant felt he was not the same, and waking up "feeling guilty." *Id.* at 8–9.

On the morning of June 4, 2015, FBI agents executed a search warrant on Defendant's apartment. (Doc. No. 324 at 9). As the search was being executed, Defendant was questioned. *Id.* at 10. At the outset of the interview, Defendant denied having a relationship with Merendino. *Id.* He also stated he was in San Diego on the night of Merendino's murder. *Id.* After Defendant was told GPS and phone data placed him in Mexico on the night of Merendino's murder, Defendant altered his story and stated that he had traveled to meet Merendino, but was only intending to obtain a key to the condominium to steal Merendino's stereo equipment. *Id.* Six months after the interview, Defendant was arrested and charged. *Id.* at 10–11.

On May 2, 2017, a jury found Defendant guilty of: (1) one count of foreign domestic violence resulting in death under 18 U.S.C. § 2261(a)(1); and (2) one count of conspiracy to obstruct justice under 18 U.S.C. § 1512(c)(2), (k). (Doc. Nos. 198, 287 at

1). Defendant was sentenced to imprisonment for life on count 1 and twenty years on count 2, to be served concurrently, an effective life sentence. (Doc. No. 287 at 2). The Ninth Circuit affirmed Defendant's conviction and sentence in a memorandum opinion entered on January 21, 2020. (Doc. No. 314).

## II.    Procedural Background

On September 16, 2021, Defendant initiated this action under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. (Doc. No. 316). On January 24, 2022, the court set a briefing schedule as to Defendant's § 2255 motion. (Doc. No. 318 at 1–2). On February 2, 2022, the Government filed a motion for a court order to find that Defendant had waived the attorney-client privilege with respect to "any communications necessary to address the claims raised by Defendant in his motion." (Doc. No. 319 at 3).

On February 3, 2022, the court issued an order requiring Defendant to respond to the waiver motion by March 11, 2022. (Doc. No. 320 at 1). The court further ordered that if Defendant did not respond by that date, then the attorney-client privilege as to all communications between Defendant and his former trial counsel would be deemed waived. *Id.* Per the Government's request, the court ordered Defendant's former counsel, Mr. Falls, to provide an affidavit to the Government as to all matters relating to Defendant's Motion. *Id.*

On February 16, 2022, Defendant filed a Motion to Appoint Counsel (Doc. No. 321) which the court subsequently denied without prejudice (Doc. No. 323). On February 22, 2022, Defendant filed a Motion to Clarify, requesting to clarify that his ineffective assistance of counsel claims were directed to both of his former trial attorneys—Richard Deke Falls and Reuben Cahn. (Doc. No. 322 at 1–2). In the Government's waiver motion, however, the Government only requested an affidavit from Mr. Falls. (Doc. No. 319 at 3). For these reasons, the court directed the Government to file a response as to whether it was intending to seek an affidavit from *both* Mr. Falls *and* Mr. Cahn. (Doc. No. 323 at 4).

On April 12, 2022, the Government filed a response, including a declaration from Defendant's former counsel, Mr. Falls. (*See* Docs. No. 324; 324-1; 325). The Government further clarified it was not seeking a separate affidavit from Mr. Cahn. (Doc. No. 325 at 1).[1] On May 9, 2022, the court granted Defendant's Motion for an extension to file his Reply. (Doc. No. 327). On June 16, 2022, Defendant timely filed a Reply. (Doc. No. 328).

## LEGAL STANDARD

Defendant's motion arises under 28 U.S.C. § 2255, which provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). "Section 2255 is a substitute for habeas corpus relief for federal prisoners." *United States v. Hill*, 915 F.3d 669, 674 (9th Cir. 2019) (quoting *United States v. Swisher*, 811 F.3d 299, 306 (9th Cir. 2016) (en banc)). To warrant relief under § 2255, a prisoner must allege a constitutional or jurisdictional error, or a "fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Timmreck*, 441 U.S. 780, 783 (1979) (quoting *Hill v. United States*, 368 U.S. 424, 428

---

[1] The court agrees with the Government that by raising a claim for ineffective assistance of counsel, Defendant has waived the attorney-client privilege as to all communications with both of his allegedly ineffective trial lawyers. *See Bittaker v. Woodford*, 331 F.3d 715, 716 (9th Cir. 2003) ("It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer.").

(1962)). The court liberally construes *pro se* § 2255 motions. *See Orona v. United States*, 826 F.3d 1196, 1199 (9th Cir. 2016).

## ANALYSIS

### I. Defendant's Ineffective Assistance of Counsel Claims

In his Motion, Defendant claims the attorneys appointed to represent him rendered constitutionally ineffective assistance of counsel in three numbered claims.[2] First, Defendant claims his attorneys were deficient in failing to rely on the "known facts of the case to raise a defense of voluntary manslaughter." (Doc. No. 316 at 4; 316-1 at 17-37). Second, Defendant claims his attorneys were deficient for failing to negotiate a plea agreement. (Doc. Nos. 316 at 6; 316-1 at 38–43). Finally, Defendant claims his attorneys were deficient by not moving to suppress his post-arrest statements on involuntariness grounds. (Doc. No. 316 at 7; 316-1 at 44–55).

#### A. Legal Standard

"Claims of ineffective assistance of counsel can be raised for the first time on a section 2255 motion." *United States v. Span*, 75 F.3d 1383, 1387 (9th Cir. 1996). Under the Sixth Amendment, criminal defendants are entitled to "effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "'The proper measure of attorney performance' when evaluating a claim that the Sixth Amendment right to effective assistance of counsel was violated is 'reasonableness under prevailing professional norms.'" *May v. Ryan*, 954 F.3d 1194, 1203 (9th Cir. 2020) (quoting *Strickland*, 466 at 688).

///
///
///

---

[2] Although Defendant raised three numbered claims for relief, Defendant's Motion contains a number of sub-claims. The thrust of Defendant's sub-claims are primarily restatements of his objections to the theory of the case defense counsel presented. The court addresses each of these sub-claims below.

6

To sustain a claim for ineffective assistance, a defendant has the burden of satisfying *Strickland*'s two-prong test. *Strickland*, 466 at 687. Under this test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* A court addressing a claim of ineffective assistance of counsel need not address both prongs of the *Strickland* test if a defendant's showing is insufficient as to any one prong. *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

### B.  *Ground One: Failure to Raise Voluntary Manslaughter Defense*

Defendant contends his trial attorneys were ineffective for "failing to rely on the known facts of the case to raise a defense of voluntary manslaughter." (Doc. No. 316-1 at 21). Specifically, Defendant contends that prior to trial, he informed trial counsel he "had in fact killed Merendino," but that the killing "was not premeditated." (Doc. No. 328 at 3). In essence, Defendant argues his former trial counsel should have tried to obtain a voluntary manslaughter verdict based on self-defense.

As an initial matter, Defendant's representations are directly rebutted by his former trial counsel, Mr. Richard Falls, who states in his sworn declaration that Defendant "never confessed to me, or to my knowledge, any defense member that he killed Mr. Merendino or was involved in his death. Therefore, affirmatively arguing to the jury that Mr. Meza killed Mr. Merendino in a heat of passion or in self-defense was not an option." Declaration of Richard Deke Falls (ECF No. 324-1, "Falls Decl.") at ¶ 4.

In his Reply, Defendant contends he admitted his involvement in Merendino's death to his other trial counsel, Mr. Reuben Cahn, and not to Mr. Falls. (Doc. No. 328 at 4).[3] Even accepting this as true, however, in light of Mr. Falls' declaration, Defendant's allegations would *also* require the court to believe that an experienced defense attorney—like Mr. Cahn—either intentionally or unintentionally failed to share Defendant's confession with the remainder of his defense team. This accounting of the events stretches the limits of plausibility.

Nevertheless, the Government chose not to obtain an affidavit from Mr. Cahn. (Doc. No. 325 at 1). As such, the court will, for the sake of argument, set aside exactly what Defendant told Mr. Cahn or Mr. Falls. Even so, a motion pursuant to § 2255 is not the appropriate vehicle to second-guess trial counsel's litigation strategy. In other words, even accepting Defendant's representations regarding what he told Mr. Cahn as true, his trial counsel's strategic decision not to pursue a theory that Defendant had killed Merendino in self-defense would not amount to ineffective assistance. Defendant's trial counsel, instead, reasonably argued the Government had not sustained its burden of proof. Even by Defendant's account, his trial counsel communicated this strategy to him, set forth the rationale, and Defendant agreed to proceed. (Doc. No. 316-1 at 18).

Defendant cannot now use this § 2255 motion to second-guess an otherwise sound trial strategy. *See Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir. 1984) ("A tactical decision by counsel with which the defendant disagrees cannot form the basis of a claim of ineffective assistance of counsel."); *Noriega-Valenzuela v. United States*, No. 1:03-CR-05111-AWI, 2013 WL 3243620, at *3 (E.D. Cal. June 26, 2013) ("Disagreements between client and counsel over trial strategy cannot support an ineffective assistance claim."); *Phinazee v. United States*, No. 1:03-CR-145, 2011 WL 2112409, at *5 (E.D. Tenn. May 27, 2011) ("A § 2255 motion does not, however, provide movants an

---

[3] Defendant provides no explanation for why he would only share this confession with one member of his trial team.

opportunity to second-guess trial counsel's sound trial strategy in an attempt to get a second bite at the apple.").

Here, given the state of the physical evidence and the prosecution's burden to prove intent, it was not unreasonable for Mr. Cahn and Mr. Falls to argue that the prosecution lacked sufficient evidence to prove Defendant's guilt beyond a reasonable doubt. Specifically, Mr. Falls argued to the jury in closing that the Government's case was based solely on circumstantial evidence and that there was no direct evidence of Defendant's guilt. (Doc. No. 232 at 79:17–23). Consistent with this theory, Mr. Falls argued a number of factors, including the location of the murder, the way Merendino was killed, the nature of Merendino's injuries, and the after-the-fact search for an alibi undermined the Government's theory Defendant had planned Merendino's murder in advance before crossing into Mexico. (*See id.* at 80:2–5; 84:14–21; 85:23–25; 86:19–21; 91:19–20; 97:3–8; 102:7–16; 104:3–13).

Although Mr. Cahn and Mr. Falls' strategy ultimately proved unsuccessful, it hardly amounted to incompetence under prevailing professional norms. *See Harrington v. Richter,* 562 U.S. 86, 105 (2011) ("The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom."). Indeed, "[t]he law does not require counsel to raise every available nonfrivolous defense." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009); *Mickey v. Ayers*, 606 F.3d 1223, 1238 (9th Cir. 2010) ("Counsel need not present a defense just because it was viable.").

An argument Defendant had killed Merendino in self-defense would have, by its very nature, been inconsistent with the defense's chosen argument that the Government had insufficient evidence linking Defendant to the murder. The defense instead contended the physical evidence suggested Merendino's death had been perpetuated by multiple unknown individuals. This was a plausible theory of the case, and it is not the court's role, or the function of a § 2255 motion, to second-guess trial counsel's strategic decisions following a trial on the merits. Instead, "strategic choices made after thorough

investigation of law and facts relevant to plausible options *are virtually unchallengeable*." *Strickland*, 466 U.S. at 690 (emphasis added).

As the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations omitted).

That is not to say that it would have been *unreasonable* for Mr. Cahn and Mr. Falls to mount a voluntary manslaughter defense. Under the deferential review required by *Strickland*, however, the court cannot say Mr. Cahn and Mr. Falls' decision not to seek a voluntary manslaughter verdict falls outside the bounds of "reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see e.g.*, *Young v. Pliler*, 273 Fed. App'x 670, 672–73 (9th Cir. 2008) (counsel not ineffective for failing to raise self-defense argument that was inconsistent with better-supported defense theory).

Indeed, it is unclear to the court how much more rigorous of a defense Mr. Cahn and Mr. Falls could have put forth on Defendant's behalf. Defendant points to little evidence—beyond his own testimony—that would support his newly recast version of the events. The overwhelming evidence at trial supported a verdict Merendino's murder

was brutal, deliberate and premeditated. There is no dispute Merendino was stabbed multiple times and dragged into a ravine—clearly undermining Defendant's self-defense theory. Defendant had an obvious motive. There was evidence Defendant meticulously lured Merendino to a relatively remote location. There was evidence Defendant sought to probate Merendino's will soon after his demise and then sought to create an alibi. There are Defendant's text messages and voicemails to Langston expressing his guilt. Although the court does not find it necessary to recount every piece of evidence, in sum, Defendant has not shown any prejudice resulting from his trial counsel's alleged deficient performance. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

        1.    *Failure to Interview Witnesses*

As part of his first numbered claim, Defendant also contends his trial counsel should have made further efforts to interview various witnesses and review pertinent documents in support of a voluntary manslaughter defense. (Doc. No. 316-1 at 24, 32–35).

Under *Strickland*, a defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "Counsel's investigation must, at a minimum, permit informed decisions about how best to represent the client." *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). Nevertheless, "the duty to investigate and prepare a defense is not limitless; it does not necessarily require that every conceivable witness be interviewed or that counsel must pursue 'every path until it bears fruit or until all conceivable hope withers." *United States v. Tucker*, 716 F.2d 576, 584 (9th Cir. 1983). "Nor does it necessarily require that counsel pore over every document which the government intended to introduce into evidence." *Id.* Instead, "[t]he specific tasks required for adequate preparation of a defense turn on the particular facts and circumstances of each case." *Id.*

Here, Mr. Falls states in his sworn declaration that Defendant's defense team did not interview Beverly Flowers, John M. Leake, and Gail Faggard—the individuals identified in Defendant's Motion (Doc. No. 316-1 at 24)—because "none of them were percipient witnesses to the alleged crimes, and none of them ever met [Defendant]." Falls Decl. at ¶ 5. As such, "[t]he only evidence they might offer was that Mr. Merendino was a heavy drinker and could be verbally abusive and manipulative when he drank." *Id.*

"A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel." *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986). Here, trial counsel's decision not to pursue Ms. Flowers, Mr. Leake, and Ms. Faggard further as witnesses for the reasons stated in Mr. Falls' declaration falls within the "wide latitude" accorded counsel for tactical decisions. *Strickland*, 466 U.S. at 689; *see United States v. Gooch*, 420 F. App'x 700, 701 (9th Cir. 2011) (rejecting ineffective assistance claim for failure to interview a witness where counsel was aware of witness' account by reviewing record); *Ray v. Cate*, No. C 11-1604 YGR (PR), 2014 WL 3841214, at *32 (N.D. Cal. Aug. 4, 2014) (unnecessary for counsel to personally interview a witness where counsel knew what the witness "would have said."). Indeed, Defendant does not identify what additional information would have been gained by the discovery he now claims is necessary.

To the extent Defendant's arguments are predicated on the more general allegation his trial counsel's "review of the government's file . . . was inadequate," (Doc. No. 316-1 at 26), this allegation is vague, conclusory, and cannot support § 2255 relief. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

    2.    *Failure for Advising Defendant Not to Testify*

As part of his first numbered claim, Defendant also contends his trial counsel "ignored" his request to testify at trial on his own behalf. (Doc. No. 316-1 at 23). It is

well established that criminal defendants have a constitutional right to testify on their own behalf at trial. *Rock v. Arkansas*, 483 U.S. 44, 51–52 (1987). "The *Strickland* standard is applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify." *Matylinsky v. Budge*, 577 F.3d 1083, 1097 (9th Cir. 2009) (citing *Medley v. Runnels*, 506 F.3d 857, 861 (9th Cir. 2007)). Nevertheless, "[a]ttorneys regularly advise their clients not to testify during trial for strategic reasons and courts routinely consider this advice to be reasonable." *Pedrin v. United States*, No. CV-17-00219-TUC-CKJ, 2019 WL 1469259, at *6 (D. Ariz. Apr. 3, 2019) (collecting cases).

Here, Mr. Falls confirms Defendant told his defense team he was willing to testify at trial, if necessary. Falls Decl. at ¶ 3. Mr. Falls states the defense team "discussed with [Defendant] prior to and during trial the pros and cons of testifying" and "recommended he not testify." *Id.* Defendant then agreed to this recommendation. *Id.* This is consistent with Defendant's sworn declaration that he did not testify based on trial counsel's advice it would "compromise the defense trial strategy." (Doc. No. 316-2 at 22).

Defendant argues his testimony would have provided context as to his statements regarding "George," the text messages and voicemail that he sent to Langston, and allowed him to recount that Merendino aggressively attacked him first in furtherance of an involuntary manslaughter defense. (Doc. No. 316-1 at 32–34). Although the court cannot be certain exactly what Defendant's testimony would have been had he taken the stand, it is clear that the good would have come in with the bad. Had Defendant taken the stand to recount his version of the events, Defendant would have been subject to damaging cross-examination. The Government could have, for example, questioned Defendant as to the incriminating nature of his text messages or his purchase of a knife immediately before traveling to Mexico. In addition, had Defendant testified that Merendino instigated the altercation, this would have both undermined the defense's

advanced theory of the case and *also* been inconsistent with statements Defendant made in his post-arrest interview.

Even crediting Defendant's representations with respect to what he told Mr. Cahn, his trial counsel's tactical decision not to have him testify was still an exercise of reasonable, professional judgment. *See Buchanan v. Beard*, No. CIV. 10-0423 GPC NLS, 2013 WL 2390435, at *38 (S.D. Cal. May 29, 2013) ("[T]he decision whether to have a defendant testify is a tactical one, afforded great deference under *Strickland*.") (citing *Matylinsky,* 577 F.3d at 1097)). For the same reasons, the court is also not convinced the testimony Defendant wished to give would have affected the outcome of the trial. *See Medley v. Runnels*, 506 F.3d 857, 861 (9th Cir. 2007) (recommendation for defendant not to testify was not prejudicial where, among other things, defendant's "self-defense would have been inconsistent with the 'someone else did it' defense previously advanced" and subjected defendant to possible impeachment from interview previously given to police). Accordingly, Defendant has not established that counsel's advice that he not testify was unreasonable or that Defendant was prejudiced as a result.

### 3. Failure to Call Dr. Clausen

Finally, as part of his first numbered claim, Defendant contends that his trial counsel should have called Dr. June Madsen Clausen to testify as a defense witness. (Doc. No. 316-1 at 31). The court is mindful "[f]ew decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial." *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999).

Defendant states Dr. Clausen would have testified as to Defendant's mental state during the altercation with Merendino and provided an explanation as to why Defendant repeatedly lied as to his role in Merendino's murder. (Doc. No. 316-1 at 31–33). Specifically, Defendant states Dr. Clausen would have testified as to Defendant's mental state as a childhood victim of sexual assault and a new father at the time of Merendino's death in furtherance of a voluntary manslaughter defense. *Id.* As already noted, however, such a defense would have been inconsistent with the theory advanced by the

defense. And in this case, it was not objectively unreasonable for trial counsel to advance a theory that an unknown group of individuals had killed Merendino.

Even assuming Dr. Clausen's testimony could have had limited probative value, the court likely would have excluded this testimony under Rule 403. Rule 403 imposes a balancing test, permitting a trial judge to exclude relevant evidence "if its probative value is substantially outweighed by a danger of" among other things "unfair prejudice, confusing the issues" or "misleading the jury." Fed. R. Evid. 403. "Applying Rule 403, courts have routinely excluded evidence that, even if relevant, might improperly confuse the jury or influence jurors by unduly distracting their attention from the charged crimes through sympathy." *United States v. Malka*, No. S319CR497NSR0509, 2022 WL 1488568, at *7 (S.D.N.Y. May 11, 2022).

Defendant admits the purpose of Dr. Clausen's testimony was to introduce himself as a victim of sexual assault and as a new father to the jury. (Doc. No. 316-1 at 31–33). Although the testimony could have probative value as to why Defendant was initially untruthful to law enforcement, the potential to engender sympathy in an inappropriate effort to excuse Defendant's commission of the charged offenses would also have been more than minimal.

Finally, this is *not* a case in which Dr. Clausen's report was ignored during all stages of the proceedings. Indeed, the court considered both Dr. Clausen's report and Defendant's upbringing carefully during sentencing. (*See* Doc. No. 295). For these reasons, the court rejects Defendant's claim he was prejudiced by trial counsel's choice not to call Dr. Clausen as a defense witness.

C. **Ground Two: Failure to Explore Possibility of Plea Agreement**

Defendant contends his trial attorneys were constitutionally ineffective in not advising him he could possibly obtain a reduced sentence by pleading guilty or in failing to obtain a plea agreement from the government. (Doc. No. 316-1 at 40). In essence, Defendant challenges his trial counsel's failure to initiate plea negotiations with the government prosecutor.

    Yet in his sworn declaration, Defendant's former trial counsel, Mr. Falls states that the defense team did discuss "the possibility of entering a guilty plea under a plea agreement" with Defendant, but Defendant was "adamant he wanted a trial." Falls Decl. at ¶ 2. Specifically, Mr. Falls states Defendant represented "he would plead guilty to obstruction of justice and lying to a federal officer, but under no circumstance would he plead guilty to killing Mr. Merendino." *Id.* For these reasons, substantive plea negotiations with the government prosecutor never seriously commenced. *Id.*

    Regardless, Defendant's contention he *would* have accepted a favorable plea offer is unavailing here. (Doc. No. 316-1 at 40). Even assuming the truth of this statement, there remains the unassailable fact that no such offer was on the table. It is well-established "a defendant does not have a constitutional right to a plea bargain." *United States v. Osif*, 789 F.2d 1404, 1405 (9th Cir. 1986); *see also Weatherford v. Bursey*, 429 U.S. 545, 561 (1977) ("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial."). Defendant's trial counsel cannot be constitutionally ineffective in failing to advise Defendant of a plea option that did not actually exist.

    As the Tenth Circuit has held in similar circumstances:

> Without any showing that the prosecution was willing to enter plea negotiations with [defendant's] counsel, or that such plea would have been acceptable to the court, or that the resulting sentence would have been different than that imposed under the Sentencing Guidelines, all that the [d]efendant urges is speculation, not a reasonable probability that the outcome would have been different. Accordingly, he cannot establish prejudice.

*United States v. Boone*, 62 F.3d 323, 327 (10th Cir. 1995); *see also Eisemann v. Herbert*, 401 F.3d 102, 109 (2d Cir. 2005) ("The failure to obtain a plea bargain is not evidence of ineffective assistance of counsel when the record does not contain evidence that one might have been offered."); *Guerrero v. United States*, 383 F.3d 409, 419 (6th Cir. 2004) (a defense attorney "cannot be charged with failing to communicate a non-existent offer

to his client."); *United States v. Cabaccang*, No. CIV. 08-00015, 2010 WL 3000196, at *13 (D. Guam July 28, 2010) ("Because trial counsel was under no duty to initiate plea negotiations, he was not required to request a plea agreement from the Government prosecutor."); *Lopez v. Jenkins*, No. 08CV0457-LAB(AJB), 2009 WL 4895274, at *19 (S.D. Cal. Dec. 10, 2009), *aff'd*, 444 F. App'x 149 (9th Cir. 2011) ("A habeas petitioner cannot establish prejudice from his counsel's failure to negotiate a particular plea when there is no evidence that the prosecution would have accepted the plea.").

For these reasons, the court cannot find that trial counsel's failure to advise Defendant regarding a non-existent plea agreement amounts to constitutionally ineffective performance.

### D. Ground Three: Failing to Move to Suppress Post-Arrest Statements on Voluntariness Grounds

In his third-numbered claim, Defendant claims his trial attorneys were ineffective in moving to suppress his post-arrest statements for an alleged *Miranda* violation, rather than on voluntariness grounds. (Doc. No. 316-1 at 47–49).

Defendant's contentions, however, are directly contradicted by the record. This is not a case, as Defendant suggests, where Defendant's trial counsel failed to timely move to suppress Defendant's post-arrest statements. From the record, prior to trial, Defendant's trial counsel filed a motion to suppress Defendant's post-arrest statements. (Doc. No. 53-1). Specifically, prior to trial, Defendant's trial counsel moved to suppress the entirety of Defendant's post-arrest statements as being allegedly obtained in violation of *Miranda*. (Doc. No. 53-1 at 8). Trial counsel *also* contended that even if Defendant had waived his *Miranda* rights, Defendant's post-arrest statements should still be suppressed as being involuntary in light of the physical and psychological pressure that had been exerted on Defendant. *Id.* at 23–26. In Response, the Government stated it did not intend to introduce statements Defendant made after a certain point of the interrogation which largely mooted the voluntariness issue. (Doc. No. 64 at 2).

Despite this, Defendant's trial counsel, Mr. Cahn, re-opened this issue by arguing in his opening statement that San Diego Detective James Brown had threatened Ms. Langston and Defendant's unborn baby during Defendant's interview.  (Doc. No. 173 at 38:11–15).   A week after opening statements were made, defense counsel re-raised the issue that all of Defendant's statements made after Detective Brown's "threat" Defendant's wife could have a miscarriage should be suppressed as involuntary.  (Doc. No. 231 at 2:7–8).

As the court noted then, it was the court's view then (as it is now) that defense counsel essentially "created this issue of involuntariness" by referencing Detective Brown's tactics in opening statement.  *Id*. at 5:23–6:18.  Nevertheless, the court considered the renewed motion on voluntariness grounds and denied it.  Based on the court's review, Detective Brown's "miscarriage" statement fell far short of the tactics used in *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981) and the court's own decision in *United States v. Duron*, No. 16cr1817 JM, 2017 U.S. Dist. LEXIS 57739 (S.D. Cal. Apr. 14, 2017).  (Doc. No. 173 at 85:15–86:2).

It is true Defendant's counsel resurrected a mooted issue during opening statements.  However, as Mr. Cahn explained then, the defense team considered it important for the jury to know what Detective Brown had done in this case.  (Doc. No. 231 at 8:12–13).  Regardless of whether or not the court agrees, the court is "not free to engage in after-the-fact second-guessing of strategic decisions made by defense counsel." *United States v. Claiborne*, 870 F.2d 1463, 1468 (9th Cir. 1989).  Further, Defendant's former counsel did re-raise the issue of voluntariness at trial.  The court carefully considered what it construed as Defendant's renewed motion to suppress and denied it. (Doc. No. 173 at 85:15–86:2).  Defendant's contentions as to his trial counsel's "errors" are, therefore, plainly contradicted by the record.

Finally, although it is unnecessary for the court to reach this analysis, Defendant's claim would still fail at the second *Strickland* prong because he cannot establish he suffered prejudice.  As Judge Korman made clear in his concurring opinion on

Defendant's direct appeal, "the admission of the post-arrest statement was harmless beyond a reasonable doubt." (Doc. No. 314 at 11). There was "substantial, independent, and credible evidence" of Defendant's guilt and "[t]he very facts that establish that [Defendant] murdered Merendino compel the conclusion that he decided to kill Merendino before crossing back to Mexico." *Id.* at 9. In view of the overwhelming evidence of Defendant's guilt, the court does not find there is any likelihood that the results of the trial would have been different in the absence of the asserted errors of trial counsel.

## II.  Evidentiary Hearing

When a § 2255 motion is made, ""[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon." 28 U.S.C. § 2255(b). "The standard is essentially whether the movant has stated a claim on which relief could be granted[.]" *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980). "A defendant is not entitled to an evidentiary hearing if the allegations do not state a claim for relief, are belied by the record or otherwise incredible, or conclusory and unsupported by sufficient factual allegations." *United States v. Whiteman*, 860 F. App'x 526, 527 (9th Cir. 2021) (citing *United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984)).

For the reasons already stated, Defendant's allegations are either plainly contradicted by the record or, even if taken as true, insufficient to demonstrate *Strickland* prejudice. The court, therefore, declines to hold an evidentiary hearing. *See Shah v. United States*, 878 F.2d 1156, 1158 (9th Cir. 1989) ("Where a section 2255 motion is based on alleged occurrences outside the record, no hearing is required if the allegations, viewed against the record, either fail to state a claim for relief or are 'so palpably incredible or patently frivolous as to warrant summary dismissal.'"); *see also United States v. Ross*, 40 F. App'x 369, 372 (9th Cir. 2002) ("Where, as here, the allegations, even if true, do not state a claim for relief, a hearing is unnecessary.") (citing *Williams v. Calderon*, 52 F.3d 1465 (9th Cir. 1995)).

### III. Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, Defendant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons set forth in this Order, the court finds Defendant has not made the necessary showing of the denial of a constitutional right and finds reasonable jurists would not find the court's dismissal of Defendant's motion debatable. The court, therefore, **DECLINES** to issue a certificate of appealability.

### CONCLUSION

For the reasons stated above, the court **DENIES** Defendant's Motion in its entirety, **DECLINES** to hold an evidentiary hearing, and **DECLINES** to issue a certificate of appealability. The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: July 21, 2022

JEFFREY T. MILLER
United States District Judge